Malcolm S. Clark v. Commissioner.
Malcolm S. Clark v. Commissioner
Docket No. 24634.
United States Tax Court
1950 Tax Ct. Memo LEXIS 112; 9 T.C.M. (CCH) 719; T.C.M. (RIA) 50210; August 30, 1950
Sidney Rigelhaupt, Esq., and Harold E. Russert, Esq., 711 Mahoning Bank Bldg., Youngstown, Ohio, for the petitioner. Clarence E. Price, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner seeks redetermination of a deficiency of $18,794.48 in income tax for 1944. The only issue is whether respondent erred in including in petitioner's income the difference between the price paid for certain shares of stock and their fair market value as the result of petitioner's purchase in the taxable year of capital stock of his corporate employer from the latter, pursuant to an option granted in a prior year. Certain additional adjustments are not contested. Some of the facts have been stipulated. Findings *113 of Fact The stipulated facts are hereby found. Petitioner, a resident of Cleveland, Ohio, filed his income tax return for 1944 with the collector for the eighteenth district of Ohio. That return reported income and disbursements on the cash receipts and disbursements basis. Petitioner has always used the cash basis in reporting income and disbursements for Federal income tax purposes. Prior to 1937 petitioner had developed a number of patents in connection with resistance welding, and he had acquired valuable engineering experience with respect to design and construction in that field. On March 31, 1937, petitioner entered into a written employment contract with the Federal Machine & Welder Company, hereinafter called the Company, an Ohio corporation, with principal office at Warren, Ohio, for the purpose of developing the Company along improved lines with respect to resistance welding machines. That contract provided, among other matters, that petitioner was to be employed as general manager for a period of five years, and that in "full payment for all the services of Mr. Clark in each and every capacity in which he is employed * * *" he was to receive a salary of $15,000 *114 a year, plus a sum equal to 7 1/2 per cent of the annual net earnings of the Company. The agreement further provided, as follows: "3. The Company hereby gives and grants to Mr. Clark, as an inducement to him to execute this Agreement, an irrevocable and unassignable option to purchase, at the price of $2.25 per share, 30,000 shares of the par value of $1 each of the authorized but unissued Common Stock of the Company as now constituted, subject to the terms hereinafter set forth. Mr. Clark may not purchase in any twelve (12) months' period during the term of his employment hereunder more than 6,000 shares, plus a number of shares equal to the difference between 6,000 shares and the shares actually purchased under such option in each of the prior twelve (12) months' periods, if any. The term of this option shall extend to the expiration of this Agreement, provided, however, that this option shall terminate immediately in the event of the decease or the voluntary resignation of Mr. Clark, but only with respect to that number of shares which he has not already become entitled to purchase under the terms hereof, and provided, further, that he or his estate, for a period of sixty (60) *115 days after his voluntary resignation or death, as the case may be, may, at his or its option, purchase all or any part of the shares which he has become entitled to purchase hereunder up to the date of such decease or voluntary resignation, at said option price. "It is expressly understood and agreed that in the event there shall be any change in the Common Stock of the Company through the declaration of stock dividends or through recapitalizations resulting in split-ups or combinations of shares of Common Stock, this option shall be adjusted proportionately so that Mr. Clark shall have the right to purchase the same proportionate common stock interest in the Company at said option price as he is entitled to purchase hereunder. * * *
"7. This Agreement shall enure to the benefit of and be binding upon the successors, legal representatives and assigns of the Company and shall enure to the benefit of but not be binding upon the legal representatives of Mr. Clark, but Mr. Clark shall have no right to assign any of his rights hereunder." On or about March 31, 1937, the bid and asked prices for the common stock of the Company were approximately $2.25 per share. Shortly after *116 entering into this contract petitioner was appointed a director and became president of the Company. Between August 31, 1937, and December 31, 1940, he purchased all the stock to which he was entitled under the option granted by the contract. He purchased a total of 27,775 of those shares on various dates between October 31, 1938, and February 3, 1940, at which times the bid and asked prices for the stock varied from $4 to $13 1/4 per share. On or about February 19, 1940, the Company adopted an "Extra Compensation Plan" for the payment of bonuses to key employees. The plan was to become effective on October 1, 1939. The Company permitted petitioner to participate in the plan, in consideration of the waiver of his right to receive the percentage of profits as provided in the agreement of March 31, 1937. In March 1941, E. Clucas, a director and principal stockholder of the Company, commenced negotiations with petitioner relative to his entering into a new employment contract. Clucas desired to obtain petitioner's services for the Company for a longer period of time. At that time petitioner was 50 years of age, married, and he had six children, of whom five were minors. Petitioner *117 refused to enter into a long-term contract of employment unless he were permitted to acquire a substantial interest in the Company. On November 12, 1941, petitioner and the Company entered into a new employment contract which provided, among other matters, that petitioner was to be employed as general manager for a period of 10 years from March 31, 1942, and that in "payment for all of the services of Malcolm Clark in each and every capacity in which he is employed * * *" he was to receive a salary of $20,000 per year. The agreement further provided as follows: "The Federal Machine & Welder Company hereby gives and grants to Malcolm Clark, as an inducement to him to execute this Agreement, an irrevocable option to purchase ten thousand (10,000) shares of the common stock of The Federal Machine & Welder Company, at Six Dollars and Fifty Cents ($6.50) per share; ten thousand (10,000) shares of the common stock of The Federal Machine & Welder Company at Seven Dollars ($7.00) per share, and ten thousand (10,000) shares of the common stock of The Federal Machine & Welder Company at Seven Dollars and Fifty Cents ($7.50) per share. "Any time within three (3) years from the date of this *118 contract, Malcolm Clark may purchase the above optioned shares, this option being void as to any shares remaining unpurchased within the above mentioned three (3) year period. "It is expressly understood and agreed that in the event there shall be any change in the common stock of The Federal Machine & Welder Company through the declaration of stock dividends, through recapitalization, or through other means, this option shall be adjusted proportionately. * * *
"This Agreement shall be binding upon and for the benefit of The Federal Machine & Welder Company, its successors and assigns. "This Agreement shall be for the benefit of the legal representatives of Malcolm Clark but, in the event of his decease, that part of this Agreement providing compensation for Malcolm Clark's services shall cease and that part of this Agreement granting an option to Malcolm Clark to purchase shares of The Federal Machine & Welder Company shall become void unless his personal representative shall, within a period of sixty (60) days after his death, purchase all or any part of said shares remaining unpurchased, at the option price." On November 12, 1941, the bid prices on the common stock *119 of the Company ranged from $6 to $6 1/8 per share, and the asked prices ranged from $6 3/8 to $6 1/2 per share. Approximately 265,000 shares were then outstanding, of which some 180,000 shares were held by about four individuals, including petitioner and Clucas, with the remaining shares in the hands of the public. Between February 17, 1942, and April 3, 1942, petitioner exercised the option through the purchase of 8,000 shares at $6.50 per share and 2,000 shares at $7 per share. On the various dates when those purchases were made the bid prices varied from $8 1/2 to $9 5/8 per share, and the asked prices varied from $8 7/8 to $10 1/8 per share. On June 8, 1942, the board of directors of the Company increased petitioner's annual salary, for the fiscal year ended September 30, 1942, to $40,000 per year. His salary continued at that rate for the fiscal years ended September 30, 1943, and September 30, 1944. He was permitted to continue to participate in the extra compensation plan for those three fiscal years. He purchased 200 shares of stock of the Company at $7.00 per share on December 17, 1942, when the bid price ranged from $6 5/8 to $6 7/8 per share, and the asked price ranged *120 from $7 1/8 to $7 1/2 per share. During the year 1943 petitioner purchased a total of 2,000 shares of stock at $6.50 per share, 7,800 shares at $7 per share, and 4,850 shares at $7.50 per share. On the various dates when those purchases were made the bid prices for the stock varied from $9 to $9 3/4 per share, and the asked prices varied from $9 3/8 to $10 1/4 per share. In each of the calendar years 1942, 1943, and 1944 petitioner received in the neighborhood of $70,000 under his employment contract and the bonus plan. He continued to serve as general manager and president of the Company. During those years petitioner purchased all the stock available to him under the option granted in the employment contract of November 12, 1941, and, in addition, he purchased approximately 7,400 shares on the open market. During the taxable year 1944 petitioner purchased 5,150 shares of common stock of the Company under the option, at $7.50 per share, or at a total cost of $38,625. The aggregate fair market value of those shares on the dates purchased totaled $59,822.15. The Company did not claim any deduction or expense for the difference between the option price and fair market values of the *121 stock purchased. That difference was not reported as compensation by petitioner in his 1944 tax return. Petitioner did not file with the Commissioner of Internal Revenue "consents" agreeing that the basis to him for the stock acquired pursuant to the option should be the actual price paid under I.T. 3795, C.B. 1946-1, 15. The option in the agreement of November 12, 1941, was not granted as additional compensation but solely for the purpose of permitting petitioner to acquire a substantial financial interest in the Company. The purchase price of $6.50 per share for 10,000 shares was the highest asked price of that stock on November 12, 1941. The option prices of $7 per share and $7.50 per share for the remaining 20,000 shares were higher than the then highest asked price. The difference between $59,822.15 and $38,625, or $21,197.15 was not taxable income to petitioner during the year 1944. Opinion The fact, which we have incorporated in our findings, that petitioner's exercise of his option to purchase his employer's stock did not constitute additional compensation disposes of the proceeding. Cf. Commissioner v. Smith, 324 U.S. 177. As in Delbert B. Geeseman, 38 B.T.A. 258, *122 and Norman G. Nicolson, 13 T.C. 690, while "there is no doubt that the added interest of" petitioner and his "proprietary attitude toward the company which would result from * * * ownership of the stock constituted one of the motives for the granting of the option," we conclude that it was not intended to compensate petitioner by rights to purchase at below market. The option to buy was insisted on by petitioner. But the evidence convinces us that it was not a bargain price for the stock that was sought, but the assurance that it would be available. Not only was the price fixed above that then prevailing on the open market, but additional quantities could be acquired only at even higher figures. Petitioner purchased thousands of shares on the market during the option period as well as those bought from the company. His rights extended, though for a limited period, to his personal representatives in the event of his death. And the option was only for three years although the employment contract covered ten. Of course the market price of the shares was higher when the option was exercised than petitioner paid under the option. Otherwise there would be nothing to which *123 any possible claim by respondent could attach. But this, in our view, was a fortuitous result, not justifying th determination that the spread was, or was intended or "contemplated" by either party, [1] as additional compensation for petitioner's services. Cf. Commissioner v. Smith, supra, &. 181.
The amendment to Regulations 29.22(a) (1) contained in T.D. 5507, 1946-1 C.B. 18, need not concern us here since by its terms it applies only to options granted after February 25, 1945. Nor do we think petitioner's failure to file the "consents" [2] described in I.T. 3795, 1946-1 C.B. 15, 17, fatal to petitioner's position. We construe that ruling as merely instructing respondent's staff that upon the filing of such consents any controversy must automatically be closed in the taxpayer's favor. The determination of the present deficiency gave all the effect to a direction to which, as being neither a statute nor even a duly constituted regulation, it was entitled. See *124 Helvering v. New York Trust Co., 292 U.S. 455. We conclude that on all the facts that determination was in error. *125 Decision will be entered under Rule 50. Footnotes
1. See I.T. 3795, permitting the employer to deduct additional compensation as an expense. Petitioner's employer did not do so. See Norman G. Nicolson, 13 T.C. 690↩.
2. "Accordingly * * * this office will hold that the exercise or transfer of such option, as the case may be, does not result in income to the employee by way of compensation under the principles enunciated in the preceding paragraphs, provided, however, that on or before July 1, 1946, the employee to whom such option is granted and any transferee thereof, and the employer corporation or any other taxpayer who granted such option to the employee, file in duplicate with the Commissioner of Internal Revenue at Washington, D.C., written consents (1) agreeing that the basis to the employee, and to any transferee of the option, for the stock acquired or to be acquired pursuant to the option shall be the actual price paid therefor and that no deduction shall at any time be claimed attributable to any aspect of the option arrangement, under section 23(a)(1) or any other subsection of the Internal Revenue Code, by the employer corporation or the taxpayer who granted the option, and (2) indemnifying the Commissioner against the filing of a claim for credit or refund, or any other action by any taxpayer concerned, inconsistent with the consents filed."↩